# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Medtronic, Inc., ) | Civil Action No.: 09-363 (JMR/JSM) |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| PETCO Animal Supplies Stores, ) | |
| Inc. ) | |
| ) | |
| Defendant. ) | |

## PETCO ANIMAL SUPPLIES STORES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY AND FOR SUMMARY JUDGMENT

This is an action for property damage sustained by plaintiff Medtronic, Inc. in a fire. The fire was caused when an unattended aquarium heater was allowed to operate in a waterless acrylic tray. Medtronic purchased this household aquarium heater at a pet store and incorporated it into a laboratory test platform for biomedical devices. Until this fire, it was a remarkably common practice for Medtronic to utilize aquarium heaters in laboratory test platforms of biomedical devices.

Medtronic alleges it purchased the subject aquarium heater at a store owned by defendant PETCO Animal Supplies Stores, Inc. PETCO did not design or manufacture, nor did it alter or amend the subject aquarium heater prior to sale (if, in fact, it did sell this heater).

Medtronic proffers Beth Anderson of Anderson Engineering of New Prague, Inc. as an electrical expert. Anderson contends the aquarium heater is defective in its design and its manufacture. These opinions, however, are unsupported by generally accepted science or lack foundation. Because the proposed testimony of Anderson fails to satisfy FRE 702, PETCO respectfully moves the Court to exclude this expert and to dismiss the negligence, strict liability and breach of warranty claims which cannot be supported absent expert testimony. In the alternative, PETCO moves to dismiss the failure to warn claim because Medtronic employees did not read the warnings that accompanied the aquarium heater, a predicate necessary for such a claim, and to dismiss the breach of warranties and Magnuson-Moss Warranty Act claims because these claims are barred by the four year repose period set forth in Minnesota Statute § 336.2-725.

## FACTUAL BACKGROUND

**Procedural History.**

This action concerns a fire that occurred on May 20, 2007, at a facility owned by Medtronic. (*See* Complaint)[1] The fire allegedly was caused by an aquarium heater. (*Id.*) Medtronic purportedly purchased the

[1]For purposes of this motion only, PETCO accepts as true all well-pleaded facts in Medtronic's pleadings. In the event the instant motion is denied, PETCO reserves the right to challenge any and all facts presented by Medtronic.

aquarium heater at a store owned by PETCO. (*Id.*)

On February 17, 2009, Medtronic commenced this action against PETCO. (*Id.*) Medtronic asserts strict liability, negligence, breach of express and implied warranties, and a violation of the Magnuson-Moss Warranty Act claims against PETCO. (*Id.*)

**Description of the Subject Product.**

The subject product is a submersible aquarium heater that was designed and manufactured by Meiko Pet Corporation, a now defunct Taiwanese entity. (Ponce Aff., Ex. A, Henkens Aff. at ¶¶2-3) It is labeled with the trademark Profile, which trademark was owned by PETCO. (*Id.* at ¶4) PETCO never exercised control over the design or manufacture of any Profile brand aquarium heaters it has sold. (*Id.* at ¶5) It never provided instructions or warnings to Meiko for use with any Profile brand aquarium heaters. (*Id.* at ¶7) PETCO never altered, amended, modified or changed any Profile brand aquarium heaters supplied it by Meiko. (*Id.* at ¶8) Rather, PETCO simply had Meiko place the Profile trademark on a preexisting aquarium heater designed by Meiko. (*Id.* at ¶6)

PETCO last carried the Profile brand aquarium heater in March of 2003. (*Id.* at ¶9) It has never received a claim that a Profile brand heater caused or contributed to a fire. (*Id.* at ¶10) Prior to this incident, PETCO was not aware of the use of aquarium heaters in biomedical device test

platforms by Medtronic or any other entities. (*Id.* at ¶11)

## Description of the Medical Device Test Platform.

In May of 2007, Medtronic employee Chris Canton designed a test platform to evaluate the capability of a catheter anchor. (Ponce Aff., Ex. B, Canton Depo. at p. 13) The test platform consisted of a controller, a linear motor, two 15½″ x 15½″ x 2½″ acrylic trays, two support fixtures, a temperature controller, two temperature probes, two aquarium heaters, and weights. (*Id.* at pp. 17-21, 24; Ponce Aff., Ex. C, Post-Fire Photograph of the Test Platform) The acrylic trays were located on either side of the linear motor. (*Id.*) Multiple catheter anchors were placed in each of the trays. (*Id.*) A fixture support in each of the trays connected the catheter anchors to the linear motor and to weights. (*Id.*) The linear motor would oscillate between the trays. (*Id.*) As the linear motor moved to one side, it would place tension on the catheter anchors on the opposite side, and *vice versa.* (*Id.*)

A saline solution was added to each of the trays to cover the catheter anchors. (*Id.*) A Stealth brand aquarium heater and the Profile aquarium heater were placed in each of the trays. (*Id.*) Power to the aquarium heaters was supplied through temperature probes. (Ponce Aff., Ex. B, Canton Depo. at p. 30) The temperature probes supplied or interrupted power to the aquarium heaters whenever the saline solution temperature

dropped below 32° C or exceeded 42° C. (*Id.* at p. 33) The saline solution and temperature setting were used to simulate an internal body environment for which the catheter anchor is designed. (Ponce Aff., Ex. D, Takekawa Depo. at p. 58)

**Use of Aquarium Heaters by Medtronic.**

It was common practice at Medtronic to use aquarium heaters in biomedical device test platforms. (*Id.* at p. 17; Ponce Aff., Ex. E, McCready Depo. at pp. 12, 13; Ponce Aff., Ex. B, Canton Depo. at p. 24) Medtronic employees, however, did not read the instructions and warnings that accompanied the aquarium heaters they used. (Ponce Aff., Ex. F, Kroska Depo. at pp. 25–27; Ponce Aff., Ex. G, Sage Depo. at p. 28; Ponce Aff., Ex. D, Takekawa Depo. at pp. 25-26; Ponce Aff., Ex. H, Zembal Depo at pp. 12; Ponce Aff., Ex. E, McCready Depo. at p. 16) In fact, these instructions and warnings were not available for Medtronic employees to reference or consult. (Ponce Aff., Ex. G, Sage Depo. at pp. 28-29; Ponce Aff., Ex. D, Takekawa Depo. at p. 25; Ponce Aff., Ex. E, McCready Depo. at pp. 16-17; Ponce Aff., Ex. B, Canton Depo. at p. 44)

Medtronic employees did not consult with or rely on the advice of PETCO or any aquarium heater manufacturer to decide if an aquarium heater was appropriate to use in its biomedical device test platforms. (Ponce Aff., Ex. F, Kroska Depo. at p. 24; Ponce Aff., Ex. G, Sage Depo. at

pp. 35-36; Ponce Aff., Ex. D, Takekawa Depo. at pp. 20-22; Ponce Aff., Ex. B, Canton Depo. at pp. 25-26)

**The Test.**

The catheter anchor test began on May 14, 2007, at 12:20 p.m. (Ponce Aff., Ex. H, Zembal Depo at p. 25) Medtronic employees Michael Takekawa, John Zembal and Ann McCready monitored the test platform. (Ponce Aff., Ex. D, Takekawa Depo. at p. 52; Ponce Aff., Ex. H, Zembal Depo. at p. 22; Ponce Aff., Ex. E, McCready Depo. at pp. 23-24) The normal practice was to check the catheter anchors for migration on a daily basis. (Ponce Aff., Ex. D, Takekawa Depo. at pp. 42, 47-48) De-ionized water was added to the trays each time the test was checked. (Ponce Aff., Ex. H, Zembal Depo. at p. 32; Ponce Aff., Ex. E, McCready Depo. at p. 23)

Takekawa was the last Medtronic employee to check on the test platform on Saturday, May 19, 2007, at approximately 9:50 a.m. (Ponce Aff., Ex. D, Takekawa Depo. at p. 51) The linear motor had stopped because it completed the required number of cycles. (*Id.* at p. 49) Although Takekawa does not recall his actions that day, a post-fire investigation revealed that he turned the power off to the Stealth heater but failed to turn the power off to the Profile heater. (*Id.* at p. 53; Ponce Aff., Ex. I, Anderson Depo. at p. 23) The test platform was left

6

unattended over the remainder of the weekend. (Ponce Aff., Ex. D, Takekawa Depo. at p. 49)

**The Fire.**

On May 20, 2007, at 9:54 p.m., the Columbia Heights Fire Department received an alarm signal from a Medtronic facility located at 800 NE 53rd Street in Coon Rapids, Minnesota. (Ponce Aff., Ex. J, CHFD Incident Report No. 07-0000898, Dated May 20, 2007) A fire had developed within the test platform. It was contained to a small bench, but not before water from the fire suppression system cascaded down several floors of the building and contaminated implantable medical devices. (Ponce Aff., Ex. K, Gunderson Depo. at pp. 11-12)

**The Investigation by Anderson.**

Medtronic retained Beth Anderson to investigate the cause of the fire. (Ponce Aff., Ex. I, Anderson Depo. at p. 5) Anderson concluded the fire originated from the Profile aquarium heater. (*Id.* at p. 149) She believes the saline solution level evaporated enough to partially expose the heater and then, absent sufficient water to dissipate the heat, the acrylic tray deformed in a manner which allowed for the loss of the remaining saline solution. (*Id.* at p. 57) Anderson believes the heater eventually ignited the waterless acrylic tray. (*Id.* at p. 149)

Anderson contends the heater is defectively designed and defectively

manufactured. (*Id*. at pp. 153, 159)

As for the design, Anderson contends the heater cannot pass an abnormal operation test contained within Underwriters Laboratories Standard 1018. (*Id*. at p. 50) UL 1018 contains certain performance tests which a heater must pass to receive a UL listing. (Ponce Aff., Ex. L, Underwriters Laboratories Standard 1018: Electric Aquarium Equipment) One such test is called an abnormal operation test. (*Id*. at § 41.3.2) For this test, tissue paper is placed on a wood board and the heater is placed on the tissue paper and covered with cheese cloth. (*Id*.) The heater must operate for 7 hours without glowing or flaming. (*Id*.)

Anderson theorizes that a UL approved heater would not have started a fire. (Ponce Aff., Ex. I, Anderson Depo. at p. 148) But she never tested this theory in a manner that replicates the conditions that existed on the day of the fire. (*Id*. at p. 159)

Anderson is not aware of any fires alleged to have been caused by a Profile heater. (*Id*. at p. 45) She cites no literature critical of the Profile design. (*Id*. at p. 46) Anderson is not aware of any of her peers whom are critical of the design. (*Id*.) She did not prepare an alternate design. (*Id*. at p. 67) In fact, Anderson has never designed an aquarium heater, nor has she provided an analysis of an aquarium heater design. (*Id*. at p. 133) Further, she has never received instruction on aquarium heater design.

(*Id.* at p. 135)

As for the manufacturing defect, Anderson believes the resistance wire was defectively manufactured. (*Id.* at p. 159) She cites arcing that occurred at the thermostat and the heating element as well as localized heating of the glass enclosure to support this proposition. (*Id.* at pp. 150-159)

Anderson did not read any of the deposition transcripts of any Medtronic employees. (*Id.* at p. 7) She does not consider how their involvement may have caused or contributed to the fire. (*Id.* at pp. 143-144)

Anderson agrees that NFPA 921 is the accepted industry standard for fire origin and cause investigations. (*Id.* at p. 118) She believes her investigation complied with NFPA 921. (*Id.*)

**The "Exemplar" Tests by Anderson—Design Defect.**

Anderson conducted two tests in an attempt to support her contention that the Profile heater does not comply with the abnormal operation test contained in UL 1018. (*Id.* at pp. 51-52) But she did not use Profile heaters in these tests. (*Id.*) Instead, she conducted tests with "exemplar" aquarium heaters. (*Id.* at p. 51) The "exemplar" heaters materially differ from the subject Profile heater in the following respects: the thermostats; the thermal protection; the voltage ratings; the resistors; the capacitors;

the heating element supports; and the power cords. (*Id.* at pp. 34, 81-86, 89-92, 169-170) Anderson is unable to state whether the bimetallic metals in the thermostats, the types of resistance wires, the lengths of the resistance wires, the diameters of the glass enclosures, or the thicknesses of the glasses are the same as that of the Profile heater because she did not bother to compare these items. (*Id.* at pp. 82-84, 90-91) She is additionally unsure if the "exemplar" heaters were made by the same manufacturer as that of the Profile heater. (*Id.* at p. 74)

The first test was not conducted for the required 7 hour duration set forth in UL 1018. (*Id.* at p. 87) It was discontinued after 3 hours because it was the end of the work day. (*Id.*) This test did not yield any glowing or flaming which would indicate a failed test. (*Id.* at p. 88) Anderson, nevertheless, classified this heater as having failed the abnormal operation test. (*Id.* at p. 89) This is because Anderson unilaterally decided to include charring—an indicator that is <u>not</u> specified in UL 1018—in her test pass/fail criteria. (*Id.* at p. 75)

The second test was conducted for 7 hours and, according to Anderson, yielded glowing. (*Id.* at p. 93) Anderson, however, did not conduct or even observe this test. (*Id.* at pp. 91-92) Nevertheless, she concluded the heater did not pass the abnormal operation test. (*Id.* at p. 149)

10

Both of the "exemplar" heaters Anderson failed are UL listed and had passed the abnormal operation test when performed by UL staff. (*Id.* at pp. 75, 80, 89) Anderson did not conduct further tests for validity despite her two contrary failure classifications. (*Id.* at p. 153) Interestingly, she agrees that either of these UL listed heaters would have caused a fire (*Id.*)

**The "Exemplar" Tests by Anderson—Manufacturing Defect.**

Anderson conducted tests to determine the effect on a heater when the thermostat and thermal switch are bypassed. (*Id.* at pp. 99-100) She bypassed the thermostat despite her concession that the Profile thermostat did not fail. (*Id.* at p. 99) She used the same "exemplar" heaters as she used for the abnormal operation test. (*Id.* at pp. 99-100) But the tests were stopped short of an actual fire. (*Id.* at p. 159) The "exemplar" heaters were never subjected to fire or sprayed with water while engulfed in fire. (*Id.*)

Anderson admits the arcing observed on the heating element and thermostat—the foundation for her opinion—could have been caused by fire impingement (as opposed to an internal manufacturing defect). (*Id.* at p. 138) Anderson does not have an identical model Profile heater or the design specifications with which to compare the subject heater. (*Id.* at pp. 51-52)

## FIRST ISSUE PRESENTED

Medtronic has the burden of showing Anderson's testimony satisfies FRE 702. Anderson is unable to satisfy the mandates of FRE 702 because her opinions do not satisfy *Daubert* scrutiny, are speculative, and will not assist the jury. Should Anderson be precluded from testifying at the trial of this matter?

## ARGUMENT

### Because Anderson's opinions do not meet the mandates of FRE 702, Anderson should be precluded from testifying.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Medtronic, as the proponent of Anderson's testimony, must show by a preponderance of the evidence that her testimony is admissible under FRE 702. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). FRE 702 allows expert testimony that "will assist the trier of fact" to be admitted. Fed. R. Evid. 702. "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Solheim Farms, Inc. v. CNH America, LLC*, 503 F.Supp.2d 1146, 1149 (D.Minn. 2007), citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir.2000). S*ee also, Loudermill v. Dow Chemical Co.*, 863 F.2d 566, 570 (8th Cir. 1988), ("if an expert opinion is so fundamentally unsupported that it can offer no assistance to the jury, then the testimony should not be admitted").

The District Court has a "gate keeping" obligation to ensure all testimony admitted under FRE 702 is reliable. *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 US 579, 589 (1983); *see also Kumho Tire Company v. Carmichael*, 526 US 137, 141 (1999) (*Daubert* gate keeping function extends to expert testimony "based on technical and other specialized knowledge"). Expert testimony is reliable if the reasoning or methodology underlying the testimony is scientifically valid. *Daubert* 509 US at 592.

*Daubert* identifies four factors for a District Court to consider when determining whether expert testimony is reliable: (1) whether the expert's hypotheses can be or have been tested; (2) whether the expert's hypotheses has been subjected to peer review; (3) the rate of error associated with the methodology; and (4) whether the methodology is generally accepted within the scientific community. *Daubert*, 509 US at 593-94. Expert testimony must be excluded if it "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 US 136, 146 (1997).

In the instant example, Anderson asserts the Profile heater is defectively designed because it cannot pass the abnormal operation test specified in UL 1018. Anderson, however, did not test any Profile heaters to reach this conclusion. Instead, Anderson draws this conclusion based upon her tests of two "exemplar" heaters. But the purported "exemplars" Anderson used for her tests are materially dissimilar from the subject aquarium heater. The thermostats, thermal protection, voltage ratings,

resistors, capacitors, heating element supports, and power cords of the "exemplar" heaters differ from the Profile heater. Anderson did nothing to account for these striking disparities. Further, Anderson never checked, and is therefore unable to confirm, whether the bimetallic metals in the thermostats, the resistance wires, the lengths of the resistance wires, the diameters of the glass enclosures, or the thicknesses of the glasses of the "exemplar" heaters are the same as the Profile heater.

Anderson's haphazard approach does not comport with NFPA 921 which mandates the use of the same make and model for comparative testing. (Ponce Aff., Ex. M, NFPA 921: Guide for Fire and Explosion Investigations § 16.10.4.2) NFPA 921 is the generally accepted guide for fire origin and cause investigations. Because Anderson did not comply with NFPA 921 and use a Profile heater and did nothing to ensure the "exemplar" heaters were typical or representative of the Profile heater, any conclusions or results derived from her tests are scientifically invalid and misleading.

In addition, Anderson cites no other fire involving a Profile heater, no literature critical of the design, and no peers whom are critical of the design. Moreover, she did not prepare an alternate design. Her *ipse dixit* proclamation of a defective design is not supported by appropriate tests, by literature, by a feasible alternate design, or by any of her peers.

Anderson hypothesizes a UL approved heater would not have started a fire. But when she tested this hypothesis, the UL approved heaters generated heat sufficient to start a fire. Anderson chooses to disregard these tests, and amazingly, maintains her hypothesis despite her own testing which undermines this hypothesis. This illogical, nonsystematic approach does not comply with NFPA 921 which requires the use of the scientific method. (*Id.* at §§ 4.1-4.3) The scientific method requires the formulation of a new hypothesis when tests do not support a given hypothesis. (*Id.*) Anderson's unvalidated hypothesis that a UL approved heater would not have started a fire is rank speculation. Her guess as to what might happen is the type of speculation *Daubert* excludes. *See Daubert*, 509 US at 590 (Proposed expert testimony must be supported by appropriate validation).

Anderson also failed to consider the role any human fault played in the cause of this fire as is required by NFPA 921. (Ponce Aff., Ex. M, NFPA 921: Guide for Fire and Explosion Investigations § 19.1.1) Although she proscribes to and claims to have followed NFPA 921, Anderson conveniently limits her opinion in this area. Oddly, she never read the deposition transcripts of any Medtronic employees; not the individual who designed the test platform, nor the individuals who operated the test platform. As such, her opinions are irrelevant because

she failed to apply her theory to the specific facts of this case as is required by NFPA 921.

Anderson's criticism of the manufacture is unsupported. She cites arcing on the heating element and the thermostat in support of her manufacturing defect opinion. But she concedes this arcing could have been caused by fire impingement. In other words, the electrical activity she observed, and asserts supports her opinion, could have been <u>caused</u> by the fire.

Anderson used the same "exemplar" heaters in an attempt to validate her manufacturing defect opinion. But she failed to conform with NFPA 921 which requires her to "ensure that the conditions or circumstances are sufficiently similar" when relying on experiments to support an opinion. (Ponce Aff., Ex. M, NFPA 921: Guide for Fire and Explosion Investigations § 4.3.6) The thermostats on the "exemplars" were bypassed to simulate a failed thermostat. But the Profile thermostat did not fail; a fact that Anderson does not contest.

Not only did Anderson fail to use an appropriate exemplar and fail to allow the thermostat to regulate the temperature, she also failed to simulate the type of environment in which the heater was subjected. She did not conduct a test inside an acrylic tray with a nearby platform stand. She did not use a temperature probe to regulate power to the

heater (rather than the thermostat). She did not allow a fire to erupt. She did not account for any salt that might remain from the saline solution. She did not spray the heater with water to simulate the fire suppression system. All of these things affect the ultimate post-fire condition of the Profile heater. As a result, the conclusions reached by Anderson are useless in this case because her tests were conducted with dissimilar heaters that were not subjected to the conditions that existed on the day of the fire.

Further, Anderson does not have a Profile heater or its design specifications with which to compare the subject heater. Because Anderson cannot state with any degree of certainty that the heater was defectively manufactured, her testimony would not assist a jury. *See Grant v. Farnsworth*, 869 F.2d 1149, 1152 (8th Cir. 1989), certiorari denied, 110 S.Ct. 252, 493 U.S. 898, 107 L.Ed.2d 202 (1989) (chiropractor's testimony would not have assisted the jury because he could not state an opinion with a reasonable degree of certainty).

Testimony by Anderson regarding the design or manufacture of the Profile heater is so fundamentally unsupported that it can offer no assistance to the jury—precisely the situation in which the 8th Circuit has determined that exclusion is appropriate. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance

to the jury must such testimony be excluded." *In Re Baycol Products Litigation*, 495 F.Supp.2d 977, 985 (D.Minn. 2007), citing *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001); citing in turn, *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995).

Anderson has inadequate factual evidence on which to base her opinions. Because her opinions are not sufficiently rooted in legitimate scientific methods or procedures, Anderson cannot reliably testify about the propriety of the design or manufacture of the subject heater. Therefore, Anderson must be precluded from testifying at the trial of this matter.

## SECOND ISSUE PRESENTED

Evidence of a defective and unreasonably dangerous product and evidence that the alleged defect proximately caused damage are necessary elements of negligence, strict liability and breach of warranty claims. Medtronic is unable to prove the subject product is defective and unreasonably dangerous and link the alleged defect to the damage without expert testimony. If this Court excludes Medtronic's expert from testifying at trial, is PETCO entitled to judgment as a matter of law?

## ARGUMENT

**Because Medtronic has no expert testimony to support its negligence, strict liability and breach of warranty claims, PETCO is entitled to judgment as a matter of law.**[2]

In Minnesota, theories of strict liability, negligence and breach of

---

[2]Although PETCO did not manufacture the product, it is in the precarious position of being in the chain of distribution. For this reason, PETCO asserts defenses to the strict liability claims of Medtronic in the event a judgment

warranty merge into a single products liability theory. *Westbrock v. Marshall Town Manufacturing Company*, 473 N.W. 2nd 352, 356 (Minn. Court App. 1991) (citing *Bilotta v. Kelley Company*, 346 N.W. 2nd 616, 623, note 3 (Minn. 1984)); *Gross ex rel. Gross v. Running*, 403 N.W. 2nd 243, 245-46 (Minn. Court App. 1987). To establish a product liability claim a plaintiff must prove that: (1) the product was in a defective condition which rendered it unreasonably dangerous to the user; (2) the defective condition existed when the product left the control of the defendant; and (3) the defective condition caused plaintiff's injury. *See Westbrock*, 473 N.W. 2nd at 356.

Absent expert testimony, Medtronic cannot prove the product was defective and unreasonably dangerous, nor can it prove that the alleged defect proximately caused the fire. The analysis of a product is a specialty area, not within the purview of the average citizen as evidenced by the numerous *Daubert* based challenges to the opinions of such experts. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786 (1995), *Kuhmo Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512 (1997), and *American Family Ins. Co. v. JVC Americas Corp.*, 2001 WL 1618454 (D. Minn. 2001). If Anderson is precluded from testifying,

---

against Meiko is deemed uncollectible.

Medtronic's product liability claim cannot survive summary judgment. *See Celotex*, 477 US at 322-33 (failure of proof as to essential element warrants summary judgment); Jaurequi v. Carter Mfg., Inc., 173 F.3d 1076, 1085 (8th Cir. 1999) (plaintiff has no defense to summary judgment without expert engineering testimony in products liability action).

Without expert testimony, Medtronic is unable to establish the product was defective and unreasonably dangerous or link the alleged defect to the fire. The jury must not be allowed to speculate as to the sufficiency of the design or manufacture. *See Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124 (D.Minn. 1998) (Finding that when it would be speculative for the fact finder to decide the issues without having the benefit of expert testimony, the expert testimony is necessary) Specialized knowledge by way of training, education and experience is necessary to assist the jury in reaching such a conclusion. Medtronic cannot rely on circumstantial evidence or *res ipsa loquitur* to show the product was defective and unreasonably dangerous. *See Holkestad v. Coca-Cola Bottling Co. of Minn., Inc.*, 288 Minn. 249, 180 N.W.2d 860 (Minn. 1970); *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1009 (8th Cir. 1998) (Plaintiff must provide something more than evidence that the accident occurred to prove defect and causation). Devoid of such evidence, Medtronic is

unable to make out a *prima facie* case on its claims asserted against

PETCO. Accordingly, all claims by Medtronic must be dismissed.

### THIRD ISSUE PRESENTED

The failure to read a warning precludes a claim regarding the adequacy of a warning. Medtronic employees failed to read the instructions and warnings that accompanied the subject aquarium heater. Does Medtronic's failure to warn claim fail as a matter of law?

### ARGUMENT

**Because Medtronic failed to read the instructions and warnings that accompanied the subject aquarium heater, it cannot claim the instructions and warnings were inadequate.**

In its Complaint, Medtronic alleges PETCO negligently failed to provide

reasonable warnings. But the failure to read a warning precludes a claim

that the warning is inadequate. *J & W Enterprises, Inc. v. Economy Sales,*

*Inc.*, 486 N.W.2d 179 (Minn. Ct. App. 1992); *Marco v. ALCOA*, 1994 WL

615004, *2 (Minn. Ct. App. 1994). In *J & W Enterprises, Inc.*, the Court

reasoned that there can be no causal link between an alleged defect and

an injury absent a reading of the warning. 486 N.W.2d at 181; *see also*

*Johnson v. Niagara Machine & Tool Works*, 666 F.2d 1223, 1225 (8th Cir.

1981) (an issue as to the adequacy of a warning necessarily presupposes

that the operator has read the warning).

Here, Medtronic employees never read the instructions and warnings

that accompanied the product. Accordingly, there can be no causal link

between any alleged deficiencies and the damages sustained.

Medtronic is further unable to demonstrate the instructions and warnings were inadequate because it did not retain the instructions and warnings which accompanied the subject aquarium heater (or those of similar products). Medtronic simply lacks proof of any alleged inadequacies of the warnings.

Medtronic offers no alternate warning or testimony regarding other manufacturers' warnings and fails to give an opinion as to the deficiency of the actual written warning; therefore, any such testimony is inadmissible. Moreover, Medtronic offers no opinions as to what the instructions, warnings, or labels should say. Medtronic has failed to provide expert testimony that satisfies FRE 702 and the rigorous *Daubert* scrutiny. Any such testimony is speculative, not based on scientific knowledge, and incredibly misleading and unhelpful to the jury.

Because Medtronic employees never read the warnings or instructions and because Medtronic has no proof of any alleged deficiencies, the failure to provide a reasonable warning claim by Medtronic must be dismissed.

## FOURTH ISSUE PRESENTED

Minnesota Statute § 336.2-725 requires that all actions for breach of warranties be commenced within four years from the breach. Breach occurs upon tender of delivery of the product. A claim under the Magnuson-Moss Warranty Act is governed by the same repose period. Medtronic purchased the product, at the very latest, in March of 2003— more than four years prior to commencing this action. Are Medtronic's

breach of warranties and Magnuson-Moss Warranty Act claims time–barred?

## ARGUMENT

**Medtronic's breach of expressed and implied warranties and Magnuson-Moss Warranty Act claims are barred by Minnesota Statute § 336.2-725.**

Minnesota Statute § 336.2-725 provides in relevant part "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." Minn. Stat. § 336.2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made . . . ." Minn. Stat. § 336.2-725(2).

Medtronic has no proof as to the date of purchase (or location of purchase). The last transaction date for a Profile heater by PETCO is March of 2003. Assuming, *arguendo*, Medtronic purchased the subject heater from PETCO, this is the latest possible date it could have done so. It is the tender of delivery of the goods, not the discovery of the breach that gives rise to the running of the statute of repose. *Klempka v. G.D. Searle and Co.*, 769 F. Supp. 1061 (D.Minn. 1993). Therefore, at the very latest, the statute of repose began to run in March of 2003. This action was commenced on February 17, 2009—more than 22 months after the repose period barred Medtronic's claim. Therefore, Medtronic's breach of warranties claims must be dismissed in accordance with the repose

period set forth in Minnesota Statute § 336.2-725 because this action was not commenced in a timely manner.

The repose period provided under Minnesota Statute § 336.2-725 also bars Medtronic's Magnuson-Moss Warranty Act claims. The Magnuson-Moss Warranty Act does not have an express statute of repose. 15 U.S.C. § 2301, *et seq.* The repose period set forth in Minnesota Statute § 336.2-725 governs. *Highway Sales, Inc. v. Blue Bird Corp.*, 504 F.Supp.2d 630 (D. Minn. 2007), affirmed in part, reversed in part 559 F.3d 782 (8th Cir. 2009); *Sernak v. Krenzan Cadillac, Inc.*, 415 N.W.2d 92, 94 (Minn. Ct. App. 1987); *see also Lowe v. Volkswagen of America, Inc.*, 879 F.Supp 28, 30 (E.D. Pa. 1995).

As such, Medtronic's Magnuson-Moss Warranty Act claims are subject to the same analysis articulated above. Therefore, Medtronic's claims under the Magnuson-Moss Warranty Act must be dismissed in accordance with the repose period set forth in Minnesota Statute § 336.2-725 because this action was not commenced in a timely manner.

## CONCLUSION

It is not PETCO's burden to show that Medtronic's expert testimony should be excluded. Medtronic must prove, by a preponderance of the evidence, that the expert opinions it offers are reliable and admissible. Medtronic cannot carry this burden. Its expert did not use an accepted

methodology, nor did she apply this methodology in a reliable manner. For these reasons, PETCO respectfully requests that this Court exclude the testimony of Anderson. PETCO further respectfully requests that this Court grant it summary judgment based on Medtronic's inability to prove essential elements of its claims.

Respectfully Submitted,

Dated: May 4, 2010

**FOLEY & MANSFIELD PLLP**

By: **s/Aaron M. Ponce**
Aaron M. Ponce (#296405)
250 Marquette Avenue, Suite 1200
Minneapolis, Minnesota 55401
aponce@foleymansfield.com
Telephone: (612) 338-8788
Fax: (612) 338-8690

**ATTORNEYS FOR DEFENDANT
PETCO ANIMAL SUPPLIES
STORES, INC.**